CLEM v. NELSON.

5-1757                                           322 S. W. 2d 448

Opinion delivered March 30, 1959.

*Talley & Owen* and *William L. Blair,* for appellant.

*T. H. Mayer,* for appellee.

CARLETON HARRIS, Chief Justice. This litigation involves a transaction between appellee, Gilbert Nelson, and appellant, Delbert S. Clem, d/b/a Clem Motor Company. Nelson purchased a 1956 Plymouth automobile from appellant Clem, for, under his contention, $1,995, and appellee asserts that he was allowed $600 for his own automobile, a 1954 Buick, which he traded in on the purchase of the Plymouth, and that appellant was to pay off a balance due on the old car of $429.94. Clem insists that no sale price was ever agreed upon; that the parties traded on a "difference"; that he was to receive $1,150 and Nelson's car, upon which Nelson would pay the balance due. Nelson signed a contract in blank, which was later filled in, and the contract was assigned to the Manhattan Credit Company, Inc. Payments were fixed at $69.71 per month for thirty months. The payments included collision insurance and life insurance. After making five payments, appellee instituted suit against appellants, alleging that the contract was usurious, praying that same be cancelled, and asking that title to the automobile be vested in him free of any lien or claim of appellants. On trial, the court held the contract to be usurious, cancelled the title retaining note, and quieted title in the Plymouth automobile in appellee; ordered that all sums paid into the registry of the court

by Nelson during the pendency of the action be returned to appellee, but denied recovery for payments voluntarily made by Nelson to appellants prior to the institution of the suit. From such decree, comes this appeal.

Nelson testified that he went to the Clem Motor Company after seeing an advertisement in the Arkansas Democrat on August 30, 1957, advertising the car (later purchased) for $1,995. He talked with a salesman named Roy Spann. Nelson stated that he wanted $600 for his equity in the car which he was trading in, and after such an agreement had been reached with the salesman, signed a "get ready" or work sheet. Appellee returned next morning and signed a contract in blank, "and I was assured that this contract I signed in blank would be identical to the one I had signed the evening before." This testimony was pretty well corroborated by Spann, who testified, "The agreement was we were to allow him six hundred dollars for his Buick, and his wife made the statement as long as we kept the payments under $70 a month, and like I said, it was definitely agreed he was to get $600 equity out of his car above the $429.00, I believe it was, pay off on his Buick." It is true that on cross-examination, Spann stated that he seemed to remember something about "a thousand dollars difference," but in the main, his testimony pretty well substantiated Nelson's version of the transaction. Mrs. Nelson likewise corroborated her husband's evidence. In other words, appellee's version of the agreement was as follows:

| "Selling price of Plymouth | | $1995.00 |
|---|---|---|
| Allowance on Buick | $1029.94 | |
| Lien | 429.94 | |
| Net Trade Allowance | $ 600.00 | 600.00 |
| Difference Owed by Nelson | | $1395.00 |
| Hazard Insurance | $ 219.50 | |
| Life Insurance | 52.28 | |
| Total Insurance | $ 271.78 | 271.78 |
| Gross Loan | | $1666.78 |
| Interest charges 10% for 30 months | | 223.15 |
| | | |
| Unpaid Balance | | $1889.93" |

J. D. Smeadley, who was manager of Clem Motor Company at the time of the transaction, testified that he told Spann that the lowest figure he could accept from Nelson was $1,150. "That would mean if he had a clear automobile, he would owe me $1,150. If he did not have a clear automobile, he owed me $1,150 plus the net pay off on his automobile. Q. So if there was $429.95 owed on the car to someone else by Mr. Nelson, then your trade-in would be $1,150 plus that? A. Yes, plus whatever he owes. Q. Come to about $1,579.94? A. Yes." In response to a question as to whether $1,995 was the amount that Nelson agreed to pay for the automobile, Smeadley replied: "I don't know what he agreed to pay other than he agreed to pay $1,150 difference. I know that. I know he agreed to that because the salesman was about two hours getting him to agree, and I was working with him, and I was trying to show him at that time he was getting a real good deal for the allowance on his car for the worth of the car."

Clem testified that the deal was strictly on the basis of a difference.

"We traded on the basis of $1,150 difference between the two cars.  *  *  *  I would get the $1,150 difference. Now I would also have to pay off his car, which is $429.94. So, therefore, I had the unpaid balance on his car, I add the unpaid balance on his car to the difference between the two cars, and that is what I received from the finance company, which is $1,579.94.

"Q. That contract reads $2,091.30. How is that figure reached?

A. That is, of course, after you add insurance and finance charges.

Q. Is that where you get that $2,091.30?

A. That's right.

Q. Now there is a figure of $600 there. Mr. Nelson testified he was to get $600 on his car. Has he been allowed $600 on that car?

A. Yes, he has been. He has been allowed $600 equity which I don't think he knows what it means. Anyway, he was allowed $600 equity. He was allowed $1,029.94, and after you subtract his pay off, $429.94, he has $600 equity.''

This version of the transaction is set out in appellants' brief as follows:

"1,150.00   Difference between Buick and Plymouth
  429.94   Paid to GMAC for Nelson
_____

$1,579.94   Received from Manhattan Credit Company
  219.50   Collision Insurance purchased by Manhattan
   52.28   Life Insurance purchased by Manhattan
  239.58   Interest Charged by Manhattan
_____

$2,091.30   Balance to be paid in 30 months at $69.71
  600.00   Trade-in
_____

$2,691.30   Time Price''

The "total time price" is shown in the title retaining note as $2,691.30.

We, like the trial court, find this "time price" to be confusing — but it does somewhat bear out appellee's version, since it shows that a definite net trade-in figure of $600 was reached. Also, Exhibit No. 7, the work sheet, heretofore referred to, recites a total cash selling price of $1,995 for the Plymouth, though only showing a net trade-in of $415.06. Nelson testified that he endeavored on several occasions to obtain a copy of the contract from both Clem and Manhattan; finally, a purported copy of the contract was made up by someone in the Manhattan office and given to appellee. This copy (Exhibit No. 3) shows the net trade-in to be $415.06. Mr. Allen Noble, assistant vice-president of Manhattan Credit Company, testified that this amount was in error, and not in accord with the actual contract. From his testimony:

"The man that gave this statement gave it in error. He should not have given it. He is not familiar with it.

Q. You keep a copy of the original contract?

A. Yes. We do not keep a copy in our files, in the bank.

Q. You keep that at the bank. If Mr. Nelson came by your office, would you have a copy of the actual contract that he signed?

A. No.

Q. Anything that was given to him would be some-one's idea of what the contract was?

A. Correct.''

Accordingly, three different versions of the agreement between the parties are shown by Exhibit No. 7 (the work sheet), Exhibit No. 3 (purported copy of contract given to Nelson), and Exhibit No. 2 (copy of contract as contended by appellants).

Be that as it may, appellants argue that there is no usury in the case at bar because the testimony reflects that the Clem Motor Company received the sum of $1,-579.94 from Manhattan Credit Company, which repre-sented the $1,150 ''difference'' plus the $429.94 which Clem paid off on the Buick. Manhattan's computation is as follows:

''Total Amount Paid to
|  |  |
|---|---|
| Clem Motor Company | $1579.94 |
| Collision Insurance, paid by Manhattan | 219.50 |
| Life Insurance, paid by Manhattan | 52.28 |
| Total Advanced by Manhattan | $1851.72 |
| Total Amount Contracted to be | |
| Received by Manhattan | $2091.30 |
| Less Total Advanced by Manhattan | 1851.72 |
| Total Interest Charged | $ 239.58'' |

Thus, appellants argue that the $1,579.94 actually was, in effect, a loan from Manhattan to Nelson; that the com-pany advanced that amount of money (plus amounts for insurance); that the interest charged on the amount ad-

vanced is a legal amount, and accordingly, no usurious charge has been made. Appellants point out our language in *Hare* v. *General Contract Purchase Corp.*, 220 Ark. 601, 249 S. W. 2d 973, as follows:

"Our cases disclose that finance companies have seized upon the 'credit price rule' as a means of obtaining more than a 10% return upon what is in form a sale, but is in substance, a loan. It is obvious that if a prospective purchaser of a car, radio, refrigerator, etc., should borrow $1,000 directly from a finance company, then buy the article with the money and execute a one-year note to the finance company for $1,200, such transaction would be usurious. But the finance companies are accomplishing the same result by having dealers in cars, radios, refrigerators, etc., handle the sale in the first instance, and under the guise of a credit price, add an excessive charge which inures to the finance company, because the dealer is reasonably confident in advance of the sale that he can transfer the papers to the finance company for his own cash price. Thus, the finance company is getting the benefit of the increase."

We cannot see the application of that language to the present case. There we were talking about finance companies that, under a cloak, made usurious charges, but definitely we did not say that a usurious charge could not be made by the dealer before the assignment of the contract. Certainly it would not be logical to allow a dealer to illegally and usuriously charge a customer, and then find no usury was committed because the finance company had paid the full amount of such charges to the dealer upon being assigned the contract. In the instant case, Nelson's transaction was with the Clem Motor Company, and the contract, which we clearly think usurious, was entered into with the dealer. The fact that Manhattan itself made no usurious charge is immaterial. In the *Hare* case, *supra,* reference was made to an earlier decision by this Court as follows:

"In the case of *German Bank* v. *DeShon,* 41 Ark. 331, this Court held that a note usurious in the hands of the payee is also usurious in the hands of a subse-

quent purchaser, though he purchased in good faith, before maturity of the note, and without any notice of the usury; and that the reason for such holding is that the Constitution makes a usurious note void, and therefore, it can gain no validity by circulation. The case of *German Bank* v. *DeShon* is an outstanding decision in our reports, and has been consistently followed. Under that holding—which we now reaffirm—the defense of *bona fide* holder, for value, without notice, is without merit against the plea of usury."

The decree is affirmed.